# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDY ZARAGOZA,<br><br>                            Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>                           Defendant. | Case No. 16-cv-00628-BAS-WVG<br><br>**ORDER:**<br><br>**(1) GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;**<br><br>**(2) DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT; AND**<br><br>**(3) REMANDING CASE FOR FURTHER PROCEEDINGS** |

      Plaintiff Fredy Zaragoza seeks judicial review of a final decision by the Acting Commissioner of Social Security ("Commissioner") denying his application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 401–433 (2012). For the reasons that follow, the Court grants in part Plaintiff's Motion for Summary Judgment (ECF No. 12), and denies the Commissioner's Cross-Motion for Summary Judgment (ECF No. 15). The matter will be remanded to the ALJ for further proceedings.

# BACKGROUND

## A. Plaintiff's Condition

On March 24, 2009, Zaragoza was admitted to Alvarado Parkway Institute Behavioral Health System due to psychosis. (Administrative Record ("AR") 246.) A mental status examination ("MSE") conducted that day showed Zaragoza was exhibiting "thought blocking" and paranoia, and he was assessed a Global Assessment of Functioning ("GAF") score of 30.[1] (*Id.*) Zaragoza was discharged three weeks later. (AR 248.)

On October 16, 2011, Zaragoza was hospitalized at his family's request after he decided to shave his entire body in public while sitting on his family's deck. (AR 263.) Zaragoza was diagnosed with schizophrenia and discharged four days later. (AR 263, 270.) In early November of the same year, Zaragoza started seeing Dr. Arash Khatami. (AR 345.) Dr. Khatami diagnosed Zaragoza with undifferentiated type schizophrenia and assessed a GAF score of 45.[2] (*Id.*) Dr. Khatami continued to treat Zaragoza until June 12, 2012. (AR 331–45.)

On October 7, 2012, Zaragoza was brought to Scripps Mercy Hospital's emergency room for repeatedly striking himself. (AR 422.) He said he heard voices that told him to hit himself. (AR 422, 451.) Zaragoza was evaluated and given a GAF score of 20.[3] (AR 452.) He was discharged on October 16, 2012, and then readmitted

---

[1] The GAF scale is used by mental health practitioners to assess an individual's level of psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994) ("DSM-IV"). A GAF between 21 and 30 indicates that a patient's behavior is "considerably influenced by delusions or hallucinations or serious impairment in communication or judgment" or suggests an "inability to function in almost all areas." DSM-IV at 32.

[2] A GAF between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

[3] A GAF between 11 and 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasional[] fail[ure] to maintain minimal personal hygiene (e.g. smears feces) or gross impairment in communication (e.g.,

the next day because the voices had returned and he was hitting himself again. (AR 372.) Two weeks later, Zaragoza was discharged and assessed a GAF score of 25–30. (AR 396–97.) On November 5, 2012, Zaragoza was readmitted to Scripps Mercy Hospital for cutting himself. (AR 367.) He was discharged ten days later. (AR 323.)

During the remainder of 2012, and from 2013 through the beginning of 2014, Zaragoza continued to receive treatment at the University of California San Diego Gifford Clinic from four different doctors. (AR 308–30.) These doctors noted that Zaragoza was improving—for example, they found that he was able to sleep a full eight hours and go to church. (*Id.*) But despite this general improvement, none of these doctors assessed Zaragoza a GAF score higher than 48. (*Id.*) At the time of the hearing before the administrative law judge ("ALJ"), Zaragoza had not been hospitalized since November of 2012.

## B. Procedural History

On December 29, 2011, Zaragoza filed an application for supplemental security income under Title XVI of the Social Security Act. (AR 29.) The claim was denied on initial review and on reconsideration. (*Id.*) Thereafter, Zaragoza requested a hearing before an ALJ. (*Id.*) ALJ Jesse Pease heard the case and determined Zaragoza was not disabled as defined under the Social Security Act. (AR 29–37.) The Appeals Council denied Zaragoza's request for review, and Zaragoza now seeks judicial review of the ALJ's decision.

## LEGAL STANDARD

An applicant for supplemental security income may seek judicial review of a final decision of the Commissioner in federal district court. 42 U.S.C. § 405(g). Federal courts will uphold a Commissioner's disability determination "unless it contains legal error or is not supported by substantial evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (citing *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d

---

largely incoherent or mute)." DSM-IV at 32.

1050, 1052 (9th Cir. 2006)).

"'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). The court must consider the record as a whole in determining whether the Commissioner's decision is supported by substantial evidence. *See Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (holding that the court may not decide by isolating a 'specific quantum of supporting evidence') (citing *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)). However, "[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal quotation marks and citation omitted).

The court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citation omitted).

## THE ADMINISTRATIVE DECISION

### A. Standard for Determining Disability

The Social Security Act ("the Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act's implementing regulations, the Commissioner applies a five-step sequential evaluation process to determine whether an applicant is disabled. *See* 20 C.F.R. § 416.920(a). "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

At step one, the ALJ must determine whether the claimant is engaged in

"substantial gainful activity."[4] 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled and does not receive benefits. If not, the ALJ proceeds to step two.

At step two, the ALJ must determine whether the claimant has a severe medical impairment, or combination of impairments, that meets the duration requirement in the regulations. *Id.* § 416.920(a)(4)(ii). If the claimant's impairment or combination of impairments is not severe, or does not meet the duration requirement, the claimant is not disabled. If the impairment is severe, the analysis proceeds to step three.

At step three, the ALJ must determine whether the severity of the claimant's impairment or combination of impairments meets or medically equals the severity of an impairment listed in the Act's implementing regulations.[5] *Id.* § 416.920(a)(4)(iii). If so, the claimant is disabled and receives benefits. If not, the analysis proceeds to step four.

At step four, the ALJ must determine whether the claimant's residual functional capacity ("RFC")—that is, the most he can do despite his physical and mental limitations—is sufficient for the claimant to perform his past relevant work. *Id.* § 416.920(a)(4)(iv). The ALJ assesses the RFC based on all relevant evidence in the record. *Id.* §§ 416.945(a)(1), (a)(3). If the claimant can perform his past relevant work, he is not disabled. If not, the analysis proceeds to the fifth and final step.

At step five, the Commissioner bears the burden of proving that the claimant can perform other work that exists in significant numbers in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Id.* § 416.920(a)(4)(v); *see also Id.* § 416.920(g). The ALJ usually meets this burden through the testimony of a vocational expert, who assesses the employment potential of a hypothetical individual with the claimant's physical and mental limitations that are supported by the record. *Hill*, 698 F.3d at 1161–62 (citations omitted). If the

---

[4] "Substantial gainful activity" is work activity that (1) involves significant physical or mental duties and (2) is performed for pay or profit. 20 C.F.R. § 416.910.

[5] The relevant impairments are listed at 20 C.F.R. part 404, subpart P, appendix 1.

claimant is able to perform other available work, he is not disabled. If the claimant cannot make an adjustment to other work, he is disabled. *Id.* § 416.920(a)(4)(v).

## B. The ALJ's Disability Determination

On April 10, 2014, the ALJ issued a written decision concluding that Zaragoza was not disabled within the meaning of the Act. (AR 37.) At step one, the ALJ found that Zaragoza had not engaged in substantial gainful activity since December 29, 2011, the application date. (AR 31.)

At step two, the ALJ found that Zaragoza had two severe impairments—"schizophrenia" and "history of polysubstance abuse." (*Id.*) The ALJ relied on objective medical evidence and the opinions of the physicians to establish the severity of the impairments. (*Id.*)

At step three, the ALJ determined that Zaragoza's impairments, alone and in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (*Id.*) Of the listings in the appendix, the ALJ considered the criteria in "paragraph B" of listing 12.03—which covers schizophrenic disorders—and "paragraph C" of listing 12.06—which covers anxiety related disorders. (AR 31–32.) The ALJ relied on treatment records, a psychiatric consultative examiner report, and Zaragoza's statements about his condition to reach his conclusion. (AR 31.)

At step four, the ALJ determined that Zaragoza's RFC had no exertional limitations[6] and the following nonexertional limitations[7]: simple and routine tasks in a non-public environment; non-intense interaction with co-workers and supervisors;

---

[6] Exertional limitations are limitations on a person's ability to meet the "strength demands of jobs," including limitations on "sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. § 416.969(b).

[7] Nonexertional limitations are limitations, other than strength demands, that limit a person's ability to meet the demands of jobs. Such limitations may include difficulty maintaining attention or concentrating, and difficulty understanding or remembering detailed instructions. 20 C.F.R. § 416.969(c).

– 6 –

work that does not require hypervigilance; work that does not make him responsible for the safety of others; and work that does not include hazardous machinery and unprotected heights. (AR 32.)

In determining the above RFC, the ALJ considered statements by Zaragoza about his symptoms, the objective medical evidence, and an opinion from the state examining physician. The ALJ applied the required two-step process to determine the credibility of Zaragoza's statements about his symptoms.[8] (*Id.*) First, the ALJ concluded that Zaragoza's medical impairments could reasonably be expected to cause the alleged symptoms. (AR 34.) Second, the ALJ evaluated the intensity, persistence, and limiting effects of Zaragoza's symptoms. (*Id.*) Although the ALJ found Zaragoza's testimony to be credible for part one of the analysis, the ALJ held that the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (*Id.*)

After discussing Zaragoza's testimony, the ALJ assigned weight to each of the physician's opinions. The ALJ gave little to no weight to the opinion of Zaragoza's treating physician, Dr. Khatami, who found extreme limitations in Zaragoza's ability to work. (AR 35, 295.) Instead, the ALJ gave "significant weight" to an examination conducted by Dr. Gregory Nicholson, a state agency physician. (AR 34–35.) Dr. Nicholson concluded Zaragoza had moderate limitations in his ability to work. (AR 35.) Based on the weight given to each opinion, the ALJ determined Zaragoza's limitations would not preclude him from substantial gainful activity. (AR 36.) Then,

---

[8] "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform a two-step analysis." *Lingenfelter*, 504 F.3d at 1035–36. "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.' " *Id.* at 1036. Second, if the first step is satisfied, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.*

because Zaragoza had no past relevant work, the ALJ proceeded to step five. (*Id.*)

At step five, a vocational expert testified that an individual with Zaragoza's age, education, work experience, and RFC could work as a packager, an inspector, or an assembler. (AR 36–37.) Based on this testimony, the ALJ determined that Zaragoza was capable of making a successful adjustment to available work in the national economy, and thus was "not disabled" under the meaning of the Act. (AR 37.)

# DISCUSSION

Zaragoza challenges the ALJ's decision on the grounds that the ALJ legally erred by giving little to no weight to the opinion of Dr. Khatami. The Commissioner contends that the ALJ properly evaluated the opinion of Dr. Khatami. The parties also dispute the appropriate remedy, should the Court find the ALJ committed legal error.

## A. Legal Standard for Treating Physicians

A treating doctor's opinion is entitled to greater weight than the opinion of doctors who do not treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citation omitted). "The rationale for giving greater weight to a treating physician's opinion is that he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citation omitted).

The degree of deference afforded to a treating physician's opinion depends partly upon whether, and to what extent, that opinion is contradicted. An uncontradicted opinion by a treating doctor is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory techniques" and is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). A contradicted opinion by a treating doctor is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

Where a treating doctor's opinion is contradicted by another doctor, an ALJ

– 8 –

may only reject the treating doctor's opinion with "specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (quoting *Ryan*, 528 F.3d at 1198). An ALJ satisfies the substantial evidence requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725.

### B.     Dr. Khatami's Opinion

Dr. Khatami began treating Zaragoza in early November 2011. (AR 345.) Zaragoza visited Khatami seven times over the span of eight months. (AR 331–45.) His last visit occurred on June 12, 2012. (AR 331.) At the initial visit, Khatami performed a MSE and determined that Zaragoza had exhibited paranoia and thought blocking. (AR 345.) Khatami assessed Zaragoza's GAF score to be 45, indicating a serious impairment in social, occupational or school functioning. (*Id.*)

Throughout subsequent treatment sessions, Khatami repeatedly noted that Zaragoza was responding to internal stimuli and talking to himself in the hallways and during interviews. (AR 335, 337, 341, 343.) On several reports, Khatami listed that Zaragoza had poor insight into his illness, and that he denied having delusions. (AR 332, 333, 335, 337, 341, 343.) Khatami also stated that Zaragoza exhibited prominent poverty of thought and speech. (*Id.*)

In March and April of 2012, Khatami noted some improvement in Zaragoza. (AR 335, 337.) He stated that Zaragoza was "observed to be responding to internal stimuli on several occasions," but that it was "less than previous visits." (*Id.*) In Zaragoza's final visit on June 12, 2012, Khatami assessed a GAF score of 40.[9] (AR

---

[9] A GAF between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed person avoids friends, neglects family, and is unable to work)." DSM-IV at 32.

332.)

On June 12, 2012, Khatami completed a mental impairment questionnaire ("Questionnaire") that concluded Zaragoza had marked and extreme functional limitations in his ability to work in a regular work setting. (AR 293–98.) Khatami supported this conclusion with clinical findings, including his assessment that Zaragoza had "difficulty with sustained attention [and] concentration, poor problem solving skills, persistent paranoid ideations, limited social skills, [and] communication." (AR 293.) Khatami found that due to Zaragoza's cognitive impairment, he could not "sustain attention adequately and cannot communicate appropriately to function in a work environment." (AR 295.) Khatami also wrote that Zaragoza's "paranoia and delusions make it difficult for him to interact appropriately with peers and public." (AR 296.) As a result of his condition, Khatami estimated that Zaragoza would miss more than four work days per month. (AR 298.) The ALJ largely rejected Khatami's opinion. (AR 35.)

## C. The ALJ's Decision to Reject Khatami's Opinion is not Supported by Substantial Evidence

The ALJ gave five reasons for rejecting Khatami's opinion. (AR 35.) First, the ALJ wrote that Khatami did not provide an explanation for his assessment, did not propose any specific functional limitations that would prevent Zaragoza from working, and did not provide an opinion on what Zaragoza could still do despite his limitations. (*Id.*) Second, the ALJ stated that Khatami's opinion was not supported by medically acceptable clinical or diagnostic findings. (*Id.*) Third, the ALJ asserted that the opinion was inconsistent with Dr. Nicholson's examination on April 27, 2012, and with the medical record as a whole. (*Id.*) Fourth, the ALJ asserted that the opinion was contradicted by Zaragoza's admitted daily activities. (*Id.*) Finally, the ALJ argued that Zaragoza was responding positively to his treatment. (*Id.*)

The Court finds that none of the reasons proffered by the ALJ constitute specific and legitimate reasons supported by substantial evidence.

First, the ALJ's argument that Khatami's assessment was not explained and was incomplete is not supported by the record. In the Questionnaire, Khatami provided multiple reasons why Zaragoza had functional limitations that would prevent him from working in a competitive environment, including "difficulty with sustained attention [and] concentration, poor problem solving skills, persistent paranoid ideations, limited social skills, [and] communication." (AR 293.) These reasons were not unsupported conjecture; they were cited as clinical findings. Khatami also wrote that Zaragoza would not be able to function in a work environment because he could not "sustain attention adequately [or] communicate appropriately." (AR 295.) Given this documentation, the ALJ's assertion that Khatami did not explain his assessment is belied by the record.

The ALJ is correct that Khatami did not state what Zaragoza could still do, but as Zaragoza points out, there is no legal rule requiring a treating physician to assess a patient's ability to work specific jobs for that physician's opinion to receive deference. Thus, the only thing the ALJ has put forward are conclusory assertions regarding the insufficiency of Khatami's opinion. This does not meet the ALJ's obligation to discuss the evidence and state the reasons for his determination. *See Reddick*, 157 F.3d at 725. Therefore, the ALJ's unsupported assertion regarding the lack of explanation underpinning Khatami's opinion is not a legally sufficient reason to reject Khatami's opinion.

Second, the ALJ's argument that Khatami's opinion is not supported by medically acceptable or clinical findings is conclusory and simply incorrect. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick*, 157 F.3d at 725. The ALJ claims Khatami primarily summarized Zaragoza's complaints. (AR 35.) That is not the case. Khatami's progress reports contain medically acceptable clinical findings that support his assessment. He diagnosed Zaragoza's condition, performed multiple

MSEs,[10] assessed Zaragoza's GAF, and took notes evaluating Zaragoza's condition at each of their treatment sessions. (AR 331–46.) Further, the ALJ provided no support for how MSEs, GAF scores, and treatment notes do not meet medically acceptable clinical or diagnostic findings. Thus, the ALJ's conclusory assertions on this point are not a legally sufficient reason to reject Khatami's opinion.

Third, the ALJ adopted an overly narrow view of the medical record to support his conclusion that Khatami's opinion is inconsistent with that record. An ALJ cannot ignore contrary evidence in the record when coming to his conclusion. *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (per curiam). "Cherry-picking" is especially troublesome when an individual has a mental issue because "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Id.* (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011)). The ALJ gave Dr. Nicholson's opinion "significant weight" because it was consistent with "the medical records as a whole," and gave Khatami's opinion "less weight" because it was "inconsistent with the objective medical evidence." (AR 35–36.) However, the ALJ did not acknowledge the totality of the objective medical evidence presented. At several points in his decision, the ALJ dismissed low GAF scores given by Zaragoza's treating physicians and instead relied on the claimant's testimony where he denied having adverse effects and suicidal ideation. (AR 34–35.) This was improper because the medical record provides substantial evidence to support Khatami's clinical findings that Zaragoza had poor insight into his own condition. A progress note from October 29, 2012 is especially telling—at that session, Zaragoza both acknowledged and denied outright that he was hearing voices. (*E.g.*, AR 393.)

Additionally, the ALJ glossed over unfavorable portions of Dr. Nicholson's

---

[10] The MSE is a structured framework used by mental health professionals to observe and describe a patient's psychological functioning at a given point in time. *See* Paula T. Trzapacz & Robert W. Baker, The Psychiatric Mental Status Examination (1993).

– 12 –

examination. The ALJ did not mention the following findings in Dr. Nicholson's exam: Zaragoza stated his mother had to cook for him; Zaragoza could not spell "world" backwards when asked to do so; Zaragoza's mother said she had to pay him to shower; and Zaragoza responded "you would not get any change back" when asked how much change there would be if two oranges costing ten cents each were purchased with a dollar. (AR 286–87.) Presumably, these findings were part of the reason why Dr. Nicholson gave Zaragoza a GAF score of 40.

Further, while the ALJ acknowledged that Dr. Nicholson gave Zaragoza a GAF score of 40, elsewhere in his opinion the ALJ dismissed the score's significance stating it was "not consistent with the findings in the medical report because a low GAF score indicates suicidal ideation . . . [and] claimant denied having suicidal ideation." (AR 34–35.) The key point, however, is that the findings in the medical record actually refute Zaragoza's denial. On October 7, 2012, Zaragoza was seen hitting himself in the head. (AR 451.) Ten days later he was "expressing auditory hallucinations which were . . . telling him to hurt himself and kill himself." (AR 414.) On October 20, 2012, he was quoted as saying "the voices are telling me to hurt myself and hurt other people." (AR 398.) Thereafter, on November 5, 2012, he was readmitted to the hospital for cutting himself. (AR 367.) By failing to consider the record as a whole, the ALJ found inconsistencies that were not, in fact, inconsistencies. Thus, the ALJ's assertion that Khatami's opinion was inconsistent with the record is not a legally sufficient reason to reject that opinion.

Fourth, the ALJ's suggestion that Zaragoza's ability to carry out certain daily activities undermines Khatami's opinion is unconvincing. Working eight hours a day in a competitive environment is not easily comparable to activities of daily living. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Only where a claimant's level of daily activity is inconsistent with the alleged limitations can those

– 13 –

activities be treated as evidence of an ability to work. *See Reddick,* 157 F.3d at 722.

On March 7, 2012, Zaragoza filled out an Adult Function Report ("AFR"). (AR 197–204.) The ALJ relied on specific statements in the AFR to support his RFC determination of "moderate limitations." In his analysis, the ALJ pointed out that Zaragoza stated he can cook eggs and hot dogs, he can dress and bathe himself, he can go out on his own, and he can handle his own bills and cash appropriately. (AR 33.) However, taken as a whole, the record and the AFR paint a picture of an individual who is significantly less functional than the ALJ suggests. In the AFR, Zaragoza stated that his mom cooks for him because he does not understand that he cannot eat burnt food. (AR 199.) He wrote that he only wears two outfits, and that he showers twice a week only because his mother insists. (AR 198.) Even Dr. Nicholson reported that Zaragoza's mother had to pay him fifty cents to shower and brush his teeth. (AR 284.) Zaragoza also stated in the AFR that he can only go out by himself if the destination is close to home ("like 5 minutes"), otherwise he needs his mother with him. (AR 200.) Zaragoza also stated that he does not "understand the value of money or how to handle it."[11] (*Id.*) Thus, in reaching his conclusion, the ALJ cherry-picked evidence to portray Zaragoza as more functional than a reading of the entire record shows. Moreover, the ALJ provided no support for why Zaragoza's alleged daily activities are relevant to his ability to work. On this record, the Court finds that Zaragoza's ability to engage in certain daily activities is not a legally sufficient reason to reject Khatami's opinion.

Finally, the ALJ's contention that Khatami's opinion deserves less weight because Zaragoza has responded to medication is unavailing. Improvement must be viewed in relation to the "overall diagnostic picture." *See Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001) (holding that "some improvement does not mean that the person's impairments no longer seriously affect his ability to function in a

---

[11] Dr. Nicholson's exam supports this statement because he noted Zaragoza's failure in making change for a dollar. (AR 287.)

– 14 –

workplace"). "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *E.g.*, *Lester*, 81 F.3d at 833.

Khatami filled out the Questionnaire on June 12, 2012. (AR 298.) The ALJ correctly noted that Zaragoza's condition had been improving at the time of Khatami's assessment. But after three more months of continued improvement, the record indicates that Zaragoza's condition declined in early October 2012. (AR 451–52.) Zaragoza spent the rest of October and the first half of November 2012 in the hospital receiving treatment. (AR 367–452.) Zaragoza was discharged on November 15, 2012, and has not since been hospitalized.

Despite Zaragoza's lack of hospitalization, all four physicians who treated Zaragoza in 2013 and 2014 never gave him a GAF score higher than 48. (AR 309–18.) Those GAF scores are consistent with the GAF scores assessed by Khatami during his treatment sessions. (AR 332, 343.) Medication can help an individual without enabling him to participate in a competitive work environment. *See Wright v. Astrue*, 624 F. Supp. 2d 1095, 1109 (N.D. Cal. 2008) (holding that a plaintiff can make great improvement after taking his medication, while still remaining limited in important areas of function). When considered in relation to the overall diagnostic picture, Zaragoza's improvement is not a legally sufficient reason to reject Khatami's opinion.

\* \* \*

In sum, the Court finds the ALJ did not provide specific and legitimate reasons supported by substantial evidence to reject Khatami's opinion. Thus, the ALJ committed legal error.

### D. Harmless Error Analysis

Having concluded the ALJ erred in giving little to no weight to Khatami's opinion, the Court must now determine whether such error was harmless. "[A]n ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'" *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)

(quoting *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008)). The court assesses whether an error is harmless by "look[ing] at the record as a whole to determine whether the error alters the outcome of the case." *Id.*

Here, the ALJ's error was not harmless. In step three of the five-step disability evaluation, the ALJ did not consider Khatami's findings of marked and extreme functional limitations in his analysis. Step three requires the ALJ to analyze Zaragoza's impairment—schizophrenia—against a list of factors outlined in 20 C.F.R. part 404, subpart P, appendix 1. The factors for schizophrenia listed in "paragraph B" of section 12.03 would be met by an individual with "marked" and "extreme" limitations. Khatami's opinion, if credited, creates the possibility of finding Zaragoza disabled at step three. Additionally, in determining Zaragoza's RFC, the ALJ incorrectly placed significant weight on Dr. Nicholson's diagnosis of "moderate limitations," while ignoring Khatami's diagnosis of "marked" and "extreme" limitations. This led to an RFC assessment that overstated Zaragoza's ability to work, and in turn, affected the Vocational Expert's testimony about available jobs that Zaragoza could perform. Thus, the ALJ's errors influenced the ultimate disability determination. Accordingly, the Court finds the ALJ committed harmful legal error.

## APPROPRIATE REMEDY

The parties disagree over the proper remedy should the Court find the ALJ committed harmful legal error. Zaragoza urges the Court to remand for an immediate award of benefits. He contends that the record has been fully developed, and that under the "credit as true" rule, crediting Khatami's opinion compels a finding that Zaragoza is disabled under the meaning of the Act. (Pl.'s Mot. Summ. J. 13.) The Commissioner argues that should the Court overturn the agency's decision, the correct approach is to remand for further proceedings. The Commissioner states that there is conflicting and ambiguous evidence that must be resolved before a finding of disability under the "credit as true" rule can be made. (Def.'s Mot. Summ. J. 10–11.) The Court agrees that remanding for further proceedings is the proper course.

"The proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Hill*, 698 F.3d at 1162 (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)). When an ALJ makes a legal error, but there are ambiguities and outstanding issues in the record, the proper approach is to remand for further proceedings, not to apply the "credit as true" rule.[12] *See Treichler*, 775 F.3d at 1105.

In this case, the Court finds there are gaps in the record concerning the proper weight to give to Khatami's opinion. The ALJ did not adequately assess Khatami's opinion when determining whether or not to give it controlling weight. The ALJ made a blanket statement claiming Khatami "did not provide medically acceptable clinical or diagnostic findings," but provided no evidence to support that statement. The ALJ also ignored the multiple MSEs Khatami conducted in his treatment sessions with Zaragoza that indicated significant functional limitations. Even when a treating physician's opinion does not meet the criteria for controlling weight, the ALJ must assess the opinion using the factors outlined in 20 C.F.R. §§ 416.927(c)(2)-(6). These factors include: the length of the treatment relationship and the frequency of examination, the extent to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether or not the treating source is a specialist regarding the issue in question. *Id.* In his decision, the ALJ did not mention, let alone analyze, any of these factors when he decided to give Khatami's opinion "less weight." (AR 35.) A contradicted opinion by a treating doctor is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Garrison*, 759 F.3d at 1012 (quoting *Orn*, 495 F.3d at 633).

---

[12] An immediate award for benefits under the "credit as true" rule is appropriate if three requirements are met: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *E.g.*, *Benecke*, 379 F.3d at 593.

– 17 –

In sum, the Court finds there are gaps in the record concerning the weight to ascribe to Khatami's opinion. These gaps must be filled before an accurate disability determination can be made. Thus, the Court remands this case to the ALJ for further proceedings.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that the ALJ legally erred when he rejected the opinion of Dr. Khatami. The Court also finds that there are gaps in the record such that there are substantial issues that have not been resolved. Accordingly, the Court **REVERSES** the Commissioner's decision and **REMANDS** the case for further administrative proceedings consistent with this opinion. On remand the ALJ must (1) adhere to the treating physician rule when determining the proper weight to assign Khatami's opinion, and analyze the relevant factors if the opinion is not given controlling weight, and (2) re-evaluate step three of the five-step disability test with Khatami's opinion included in the analysis. Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** (ECF No. 12) and the Commissioner's Cross-Motion for Summary Judgment is **DENIED** (ECF No. 15).

**IT IS SO ORDERED**.

**DATED:** July 12, 2017

Hon. Cynthia Bashant
United States District Judge